UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

---

UNITED STATES OF AMERICA          CRIMINAL NO. 06-50089

versus                            JUDGE HICKS

DOYLE KORDELL HAWK                MAGISTRATE JUDGE HORNSBY

---

## REPORT AND RECOMMENDATION

**Introduction**

Before the court is **Defendant's Motion to Suppress  (Doc. 16)** challenging the validity of a search of the vehicle driven by Defendant.  Defendant argues that the traffic stop the preceded the search in question was extended beyond the initial reason for the stop; that there was no reasonable suspicion to extend the duration of the traffic stop; and that Defendant's subsequent consent to a search of his vehicle was the product of his illegal detention.  For the reasons that follow, it is recommended that Defendant's Motion to Suppress be denied.

**The Facts**

An evidentiary hearing was held on Defendant's motion on August 2, 2006.  Evidence at the hearing includes a videotape from the dashboard camera of Trooper James Nash's patrol car.  Govt. Ex. 1.

The evidence establishes the following facts.  On February 8, 2006 Trooper Nash initiated a routine traffic stop of Defendant on I-20 because Defendant was following another

vehicle too closely (video 15:25:42).  Defendant and Trooper Nash exited their respective

vehicles and began a conversation while standing between the two vehicles.  Trooper Nash

told Defendant why he had been stopped.  Trooper Nash also asked Defendant several

questions about his travel plans, and he asked Defendant for the name of his passenger.

Trooper Nash also requested Defendant's driver's license.

Defendant told Trooper Nash that he was from Alabama and was traveling from Texas

to Alabama.  Defendant told Trooper Nash that his passenger's name was Richard Wallace,

and that he and Wallace were cousins.

Trooper Nash then walked to the passenger side of the vehicle and engaged the

passenger in a similar conversation.  Trooper Nash also requested the passenger's driver's

license and the registration for the vehicle.  The passenger identified himself as Richard

Wilson (not Wallace), and he handed Trooper Nash a rental agreement for the vehicle, which

had been rented in the name of Defendant's girlfriend (who was not in the vehicle).  The

passenger said that he and Defendant were "home boys" (not cousins).  The passenger stated

that they were traveling to Georgia (not Alabama).

During the conversation with the passenger, Trooper Nash noticed that the passenger

was breathing rapidly and taking shallow breaths.  He also noticed a faint odor of marijuana

and a strong odor of air freshener.

Trooper Nash then left the passenger side of the vehicle and returned to talk to

Defendant (15:30:06).  He again asked Defendant where they were going, and Defendant

again said Alabama.  Trooper Nash detected that Defendant was nervous, and he asked Defendant why he was talking so fast.

Trooper Nash then returned to his patrol car and initiated computer background checks on both men.  In the meantime, Defendant stood between the two vehicles and, according to the video, behaved as if he was extremely cold.  It appears from the video that Defendant asked for his jacket, and Trooper Nash agreed to retrieve it for him from Defendant's vehicle (15:35:20).

When Trooper Nash approached the driver's side of the vehicle to get Defendant's jacket, he saw through the window that the passenger was reaching for something.  Trooper Nash told the passenger that he wanted whatever the passenger had been reaching for.  The passenger stated he was putting up his phone.  Trooper Nash told the passenger to stop playing games.  Trooper Nash then returned to the rear of Defendant's vehicle and handed Defendant his jacket (15:35:50).

Trooper Nash then returned to his patrol car and waited for the results of the computer background checks.  Before the results were received, however, Trooper Nash exited his vehicle and approached Defendant and asked Defendant to hold up his hands (15:37:14).  According to the video, Trooper Nash apparently believed that Defendant was retrieving something from his jacket.  Defendant identified the item in the jacket as Defendant's anti-acid pills.  Defendant told Trooper Nash that the pills were for his acid reflux condition.

Trooper Nash again returned to his vehicle and waited for the computer background checks to be completed. The results of the computer background checks were transmitted to Trooper Nash by radio, and Trooper Nash learned that Defendant and his passenger had a criminal history for drugs, burglary and other crimes (15:38:15 to 15:40:05). However, both men had valid driver's licenses issued from the State of Texas, and there were no outstanding warrants for either of them.

Once Trooper Nash obtained the criminal histories, he decided to ask Defendant for consent to search the vehicle. He also requested assistance from another trooper (15:42:50). Trooper Nash prepared a citation, exited his patrol car and returned to Defendant. Trooper Nash advised Defendant that he must maintain at least three car lengths between his vehicle and other vehicles (15:43:50). Trooper Nash then gave the citation to Defendant and explained to Defendant how the citation could be handled without a court appearance (15:45:16).

Defendant started to walk back to his vehicle, but he returned to Trooper Nash and asked him to confirm the proper distance to be maintained between vehicles. Defendant then turned away from Trooper Nash again and began to return to his vehicle (15:45:56). As Defendant started to walk away, Trooper Nash called out to him by his first name and asked him if he could talk to him for a second (15:46:00). Defendant agreed. Trooper Nash then explained that the state police often see drugs and other illegal contraband on the interstate. Trooper Nash asked Defendant if he had anything like that. Defendant replied that he did

not. Trooper Nash then asked Defendant for permission to search his car. Defendant orally agreed to the search, but protested that he had "no drugs" in his vehicle. During the discussions leading up to the search, Defendant twice denied having drugs in his vehicle. Those denials increased Trooper Nash's already existing suspicions that there was illegal contraband in the vehicle.

After Trooper Nash obtained oral consent to search the vehicle, he engaged Defendant in general conversation while waiting for backup to arrive (15:48:06). Trooper Nash testified that, to ensure officer safety, troopers do not search a car alone.

After Trooper Brett Davis arrived, Trooper Nash provided Defendant with a Louisiana consent to search form (15:50:29). Govt. Ex. 2. Trooper Nash told Defendant to read over the form, and if Defendant agreed with it, to sign the form, but if Defendant did not agree with the form, then he should not sign it. Defendant read and signed the form, and the officers patted down Defendant and the passenger. During the pat down, the passenger pulled a large sum of money out of his pocket.

While being patted down, Defendant asked Trooper Nash why he was being searched. Trooper Nash responded that he was patting him down for safety. Trooper Nash also told Defendant and the passenger that they were acting very nervous, and that their stories did not match up.

The search of the automobile then began (15:52:00). Shortly thereafter, the troopers discovered a large black suitcase in the trunk of Defendant's automobile containing 81

plastic bottles filled with drugs. Trooper Nash showed Defendant one of the pill bottles and asked him to whom it belonged. Defendant responded simply by turning around and putting his hands behind his back as if he was preparing to be handcuffed (15:58:01). Defendant and the passenger were both handcuffed, and the vehicle was removed to Troop G headquarters.

Because Defendant argues that the stop was unlawfully extended, the times reflected on the videotape at key times during the stop bearing emphasizing. The traffic stop began at approximately 15:25:42. Trooper Nash began receiving a radio report with the suspects' criminal histories at approximately 15:38:15, or about 12 minutes into the stop. (The transmission of the report on their criminal histories ended at about 15:40:05.) Trooper Nash requested backup at approximately 15:42:50. Trooper Nash handed Defendant the citation for following too closely, allowed Defendant to begin to return to his vehicle, and then called Defendant back to ask him for consent to search at approximately 15:46:00, or about 20 minutes into the stop. Defendant was presented with (and then signed) the Louisiana consent to search form at approximately 15:50:29, or about 25 minutes after the stop began. The pill bottles were discovered during a search of the trunk at approximately 15:58:01, or about 32 minutes after the stop began.

**Law Regarding Traffic Stops**

The legality of a traffic stop is analyzed under the framework articulated in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). <u>See</u> <u>Knowles v. Iowa</u>, 525 U.S. 113, 117 (1998); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984); <u>United States v. Brigham</u>, 382 F.3d 500, 506 (5th Cir.

2004)(en banc). Under the two-part <u>Terry</u> reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." <u>Terry</u>, 392 U.S. at 19-20; <u>Brigham</u>, <u>supra</u> at 506-507; <u>U.S. v. Lopez-Moreno,</u> 420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. <u>See</u> <u>United States v. Breeland</u>, 53 F.3d 100, 102 (5th Cir.1995). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002); <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. <u>See</u>, <u>e.g.</u>, <u>United States v. Santiago</u>, 310 F.3d 336, 340 (5th Cir.2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. <u>Arvizu</u>, 534 U.S. at 274. However, it is clear that the officer's mere hunch will not suffice. <u>Terry</u>, 392 U.S. at 27. It is also clear that reasonable suspicion need not rise to the level of probable cause. <u>Arvizu</u>, 534 U.S. at 274.

An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. <u>United States v. Lenz</u>, 162 Fed.

Appx. 379, 382 (5th Cir. 2006).  The Supreme Court has made it clear that an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment.  Scott v. United States, 436 U.S. 128, 138 (1978); Devenpeck v. Alford, 543 U.S. 146 (2004) ("Our cases make clear that an arresting officer's state of mind ... is irrelevant to the existence of probable cause.  [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); Whren v. United States, 517 U.S. 806 (1996) ("We think these cases ... foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.").  On this point, the Fifth Circuit has stated that "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ...."  Goodwin v. Johnson, 132 F.3d 162, 173 (1997).

As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at 507.  In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08.  An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508.  Indeed, the

officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which <u>Terry</u>'s second prong is aimed." <u>Id</u>.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. <u>Brigham</u>, 382 F.3d at 510. <u>See</u> <u>also</u> <u>Santiago</u>, 310 F.3d at 341-42; <u>United States v. Jones</u>, 234 F.3d 234, 241 (5th Cir. 2000); <u>United States v. Dortch</u>, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000). A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. <u>See</u> <u>Brigham</u>, 382 F.3d at 507; <u>United States v. Grant</u>, 349 F.3d 192, 196 (5th Cir. 2003). However, mere "uneasy feelings" and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking. <u>U.S. v. Estrada</u>, ____ F.3d ____, 2006 WL 2256493 (5th Cir. 2006).

**Analysis**

The first prong of the <u>Terry</u> analysis -- whether the stop was justified at its inception -- is easily satisfied in this case. Trooper Nash observed Defendant following another vehicle too closely while traveling on I-20. Accordingly, Trooper Nash had probable cause to stop Defendant for that traffic violation.

The court now turns to the second part of the <u>Terry</u> test – whether the officers' subsequent actions were reasonably related in scope to the circumstances which justified the interference in the first place. <u>United States v. Chabezz</u>, 993 F.2d 431, 435 (5th Cir. 1993). Under <u>Brigham</u>, the officers' subsequent actions may also be related to dispelling the officers' reasonable suspicion developed during the stop. <u>Brigham</u>, 382 F.3d at 507.

In support of his Motion to Suppress, Defendant relies primarily on <u>United States v. Dortch</u>, 199 F.3d 193 (5th Cir. 1999) *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000), and <u>United States v. Santiago</u>, 310 F.3d 336 (5th Cir. 2002). As shown below, however, the facts of those cases (both of which were decided before the en banc decision in <u>Brigham</u>) are distinguishable from the facts of this case.

In <u>Dortch</u>, two officers stopped a vehicle at approximately 11:30 p.m. for following too closely on I-20 in Beaumont, Texas. The driver exited the car at the officer's request and produced his license and car rental papers, and he consented to a pat down search for weapons. No weapons were found. The officer examined the rental papers and determined that the car was rented to a third person and the driver was not listed as an authorized driver. The officer then questioned the driver and his passenger. The men gave inconsistent answers about the driver's relationship to the person who had rented the car and their travel plans.

While one officer questioned the driver, the other officer performed a computer check for warrants and to determine whether the car was stolen. About eight minutes into the stop and while the computer check was pending, an officer requested consent to search the

vehicle. The driver gave consent to search the trunk, but not the vehicle; no search was performed at that time.

The officers told the driver he would be free to leave after the check for warrants was complete but that the officers would detain the car until they had performed a K-9 search of it. A K-9 unit was then called. The driver was again patted down for weapons and again nothing was found.

About 14-15 minutes into the stop, the officers received the driver's criminal record and questioned him about it. The driver was not told that the computer check was complete, although it was, or that the driver would be free to go at any time. Approximately 19-20 minutes after the stop began, the officers noticed the arrival of the K-9 across the four-lane interstate and median. At that time, they informed the driver that the computer check had been completed and turned up nothing, but that the K-9 was going to perform a search nonetheless. The driver remained at the scene, and his driver's license and rental papers remained with the officers on the clipboard.

Another ten minutes elapsed during the K-9 search. The K-9 alerted on the driver's side door and seat. However, the subsequent search of the car uncovered no contraband. The K-9 handler then informed another officer that there could be contraband on the body of the person who had been sitting in the driver's seat. The driver then consented to a third pat down search. This time, however, the officer conducted a more thorough search of the driver's person and noticed a large hard bulge in his crotch area. The bulge was bags of

cocaine. The driver was later charged with and found guilty of possession with intent to distribute cocaine.

On appeal, the driver did not question the legality of the initial stop, the K-9 search of the vehicle or the first two pat down searches. Instead, he argued that at some point the detention became unreasonable and exceeded the scope of intrusion allowed under Terry and, therefore, the subsequently discovered cocaine was inadmissible as fruit of the poisonous tree. Alternatively, he argued that the third pat down search was itself unreasonable because of a lack of probable cause or consent.

The Fifth Circuit found that, while the detention and questioning of the driver during the running of the computer check was lawful, the Constitution was violated when the detention extended beyond the valid reason for the initial stop. Dortch, 199 F.3d at 198. The driver did not feel free to leave even after the computer check was completed, because the officers still held his license and rental papers and they told him they were going to detain the car until the K-9 arrived. The driver's acquiescence to stick around while the dogs completed their search could not be considered voluntary.

There was no reasonable suspicion that the driver was involved in drug trafficking. Id. at 199. The answers he and the passenger gave, even if suspicious, did not give rise to that inference. Rather, the answers gave rise only to a reasonable inference that the car might have been stolen. When the computer check came back negative, the driver should have been free to leave at that point. Once he was not permitted to drive away, the extended detention became an unreasonable seizure because it was not supported by probable cause.

The officers offered no justification for the 9-10 minute delay in requesting the K-9. Id. at 200. The officers' main duty was drug interdiction, including checking suspected vehicles for narcotics. It was reasonable, therefore, to expect that they would have anticipated needing a K-9 within a few minutes of stopping a suspect. Although the dog's alert on the car established probable cause to search the interior of the car and to detain the driver until a more thorough search could be completed, by then it was too late – any probable cause established as a result of the K-9 search was subsequent to the unlawful seizure. Id.

The Court then addressed the issue of consent. Although the driver's detention exceeded the scope of a Terry stop, his consent to search may, but does not necessarily, dissipate the taint of a prior Fourth Amendment violation. Where there has been a prior constitutional violation, the government's burden to prove the defendant consented becomes more difficult. Id. at 201. Consent does not remove the taint of an illegal detention if it is the product of an illegal detention and not an independent act of free will. Id. at 202. In light of the prolonged unlawful detention of the driver, and in light of the fact that his previous refusals to consent to searches of the car were seemingly ineffective, the Court found that his consent could not be considered an independent act of free will. The Court noted that it was apparent from the videotape that the officers intended all along to detain the car until the dog arrived.

The Fifth Circuit concluded that, even if the driver's consent was voluntarily given, the consent was not valid. Because the causal chain between the illegal detention and the

consent to the third body search was not broken, the search was nonconsensual. And because there was no probable cause to search the driver's person, the evidence obtained during that search should have been suppressed. Id. at 202-203.

In United States v. Santiago, supra, the trooper pulled the defendant over on the belief that the motorist's view was unlawfully obstructed by trinkets hanging from the motorist's rearview mirror. 310 F.3d at 338-39. The defendant also was traveling 50 mph in a 70 mph zone. After stopping the motorist, the trooper began to suspect that the car was stolen: the driver appeared nervous because his hands were shaking, the driver was traveling straight through to a distant destination, the driver could not remember his wife's name, the driver's vehicle was registered in another woman's name who was not the defendant's wife, and the driver had an explanation that was inconsistent from that of his passenger as to the parties' ultimate destination.

The officer then ran a computer check of the defendant's license and registration, which eventually came back negative. Instead of returning the defendant's license and registration, the trooper called for and waited for backup. The officer then explained problems with drugs being smuggled on the interstate highways, and he asked for and obtained consent to search the car. A sealed compartment was discovered in the trunk. The trooper then called for a K-9 which alerted on the car. A subsequent search at the state police headquarters revealed drugs concealed within a false floor.

The Fifth Circuit concluded that the factors upon which the officer relied were insufficient as a basis for reasonable suspicion of drug activity because the officer had not

articulated an objective basis to warrant a finding that Santiago had narcotics in his vehicle sufficient to justify the extended detention.  <u>Id</u>. at 342.  The trooper's original justification for the stop ended at the time the computer check was completed.  At that point, there was no reasonable suspicion that the defendant was trafficking in drugs, but the trooper nonetheless continued his interrogation.  The court also noted that Santiago was stopped at 9:00 a.m; the highway on which he traveled was not deemed a major drug corridor; and Santiago's computer check did not elicit that he had a prior arrest or criminal record.   There also was no evidence that, before asking for consent to search, the trooper had returned the driver's license and registration to defendant or told him that he was free to go.  Under the circumstances, it was unreasonable for the trooper to continue to detain the defendant after the records check was completed.  The Fifth Circuit concluded that the defendant's consent to search was not an independent act of free will, but rather a product of an unlawfully extended detention.  <u>Id</u>. at 343.

Defendant's briefs (Docs. 16 & 20) do not cite or address the Fifth Circuit's en banc decision in <u>Brigham</u>, which clarified the applicable law in the Fifth Circuit.  In <u>Brigham</u>, the driver and three friends were pulled over at approximately 4:13 p.m. on a highway in East Texas for following too closely.  The officer approached the driver and asked him to step out of the car and provide his license and insurance papers.   The driver complied and produced a car rental agreement listing a 50 year old female as the lessee.  No other drivers were authorized on the rental agreement.  It did not appear that the 50 year old female was among the passengers in the car, so the officer became suspicious.  The officer began asking the

driver a series of basic questions about his group's travel plans.  The driver stated they were

coming from Houston.  The driver stated they had stayed at a La Quinta Inn, but he had

difficulty explaining where the motel was located.  The driver also avoided eye contact and

appeared to be extremely nervous.  He responded to the officer's questions with questions

of his own.  Based on the officer's experience, he believed the driver was fabricating answers

to the questions, and the officer decided to verify the driver's story with other occupants of

the car.

At 4:17 p.m., four minutes after the stop began, the officer asked a passenger to step

out of the vehicle.  The passenger produced an I.D. card that the officer suspected was fake.

The passenger's description of the group's travel plans was inconsistent with that offered by

the driver.  The passenger also avoided eye contact and appeared extremely nervous.

At 4:20 p.m., the officer questioned the other two occupants.  Both appeared confused

and also were inconsistent concerning the group's travel plans.  The officer then returned to

his car to run computer checks on the car and the I.D. cards he had received.  He told the

driver that if his license was clean, they would soon be back on their way.  Even though the

car checked out, the officer remained suspicious given the behavior of the driver and

occupants, their inconsistent descriptions of their travel plans and because, in his experience,

the fact that a car is not yet reported stolen does not necessarily indicate that it was not

actually stolen.

At 4:29 p.m., the results of the I.D. checks suggested that one of the occupant's I.D.

card was likely a fake.  The officer confronted that occupant and eventually learned his real

name.  The officer then returned to his car to check the occupant's actual identity.   While that check was pending, the officer requested and received back-up from another officer.

The officer then provided the driver with a written warning for following too closely and returned his driver's license to him.  He explained to the driver that one of his responsibilities was to intercept illegal contraband such as guns, stolen property and narcotics.  The driver denied that any illegal items were in the car and acceded to a request for a search.   The officer removed all of the passengers from the car and patted them down.  At 4:42 p.m., approximately thirty minutes after the stop began, the officer discovered a cooler containing liquid codeine located in the trunk of the car.

The driver did not challenge the validity of the initial traffic stop.  Instead, he argued that the officer exceeded the scope of the valid stop and prolonged the occupants' detention excessively and unconstitutionally when, after determining that neither the driver nor the other occupants of the car were its authorized drivers, the officer interrogated them about their travel plans and then instituted computerized vehicle and I.D. checks.

The initial panel decision held that the officer unconstitutionally extended the traffic stop by questioning the driver *before* he began a computer check on the I.D.s and the rental car's registration.  The panel also held that the driver's consent to search the vehicle was involuntary because it was tainted by the Fourth Amendment violation.  The underlying conviction was reversed.

The en banc Fifth Circuit found no Fourth Amendment violation and affirmed the conviction.  According to the Court, the panel's decision erroneously required the officer to

return to the patrol car immediately after the officer learned that none of the occupants seemed to be an authorized driver and undertake a registration check to determine whether the car had been reported stolen. Such an approach "misunderstands the Supreme Court's insistence on reasonableness rather than prescriptions for police conduct under the Fourth Amendment and extends this circuit's precedents too far." Id. at 507. Instead, the "correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." Id. The detention must be temporary and "last no longer than necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Id., citing Dortch, 199 F.3d 200.

There is no constitutional impediment to an officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and run a computer check on them. Id. at 508. The officer also may ask about the purpose and itinerary of a driver's trip. Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made. All of these inquiries are within the scope of investigation attendant to the traffic stop. Id.

The Court rejected any notion that a police officer's questioning, *even on a subject unrelated to the purpose of a routine traffic stop*, is itself a Fourth Amendment violation. Id. "Detention, not questioning, is the evil at which Terry's second prong is aimed." Id. "Mere police questioning, without some nonconsensual restraint on one's liberty, is not a 'seizure'"

or detention." Id.  A consensual interrogation may follow the end of a valid traffic stop, and such a consensual encounter does not implicate Fourth Amendment concerns.  Id.

The officer's questioning of the driver and the occupants was within the scope of the detention justified by the traffic stop, particularly after the officer ascertained that the driver was not the owner or lessee of the vehicle; the lessee was not present in the car; and the versions of the itinerary conflicted.  The process, from the time the officer started questioning the driver until he returned to his patrol car to check the registration, lasted only seven minutes.

Equally within the legitimate scope of the stop were the registration and license checks that the officer performed on the vehicle and its occupants.  And once the officer learned that one occupant's I.D. card was a fake, he acted reasonably through further questioning to uncover the occupant's true identity and perform a correct background check.  Because the officer was still waiting for the computer check at the time that he received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation.  Id., citing Shabazz, 993 F.2d at 437.

The Fifth Circuit emphasized that there is "no constitutional stopwatch on traffic stops."  Id. at 511.  Instead the relevant question in assessing whether a detention extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."  Id. Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular

sequence with, other efficient means. <u>Id</u>. There is no single formulaic approach that an

officer must adopt in order to allay his reasonable suspicions during a traffic stop. <u>Id</u>. at 512.

According to the Court:

> [W]e do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or the length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: **a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop**. [Emphasis added.]

<u>Id</u>. Because there was no Fourth Amendment violation, the driver's consent to search the

vehicle was not unconstitutionally tainted. His consent was voluntarily given, and the

evidence obtained from the car was properly obtained as the result of a consensual search.

<u>Id</u>.

**Trooper Nash's Reasonable Suspicion**

In this case, Trooper Nash acted properly in questioning Defendant and the passenger

about their travel plans, relationship to each other and the registration of the vehicle. During

the questioning, Trooper Nash developed reasonable suspicion that illegal contraband was

located in the vehicle. Defendant and the passenger gave inconsistent answers about the

passenger's identity and their itinerary. The vehicle had been rented in the name of someone

who was not present. Both Defendant and the passenger showed signs of extreme

nervousness, including rapid and shallow breathing. Their criminal histories showed prior

convictions for drug and other offenses. The passenger was seen behaving as if to conceal

something inside the vehicle. Trooper Nash also detected the smell of marijuana (and a strong smell of air freshener) coming from the vehicle. The smell of the marijuana by itself has been found to give rise to probable cause to search the vehicle for drugs. See, e.g., United States v. Lork, 132 Fed. Appx. 34 (5th Cir. 2005)(detectable odor of marijuana emanating from a vehicle provides probable cause for the search of the vehicle); United States v. McSween, 53 F.3d 684, 686-687 (5th Cir. 1995)(the smell of marijuana alone may be enough for a finding or probable cause); United States v. Reed, 882 F.2d 147, 149 (5th Cir.1989) (the officer's detection of marijuana "in itself ...justified the subsequent search of [the defendant's] vehicle"); United States v. Henke, 775 F.2d 641, 645 (5th Cir.1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."); United States v. Gordon, 722 F.2d 112, 114 (5th Cir.1983) (same); United States v. McLaughlin, 578 F.2d 1180, 1183 (5th Cir.1978) (same).

Based on the totality of all of the circumstances faced by Trooper Nash, he was justified in extending the length of the traffic stop and seeking Defendant's consent to search the vehicle. Trooper Nash's suspicion that the vehicle contained illegal contraband distinguishes this case from Dortch, and Santiago where there was no reasonable suspicion of drugs prior to the time the officers received consent to search. Brigham, 382 F.3d at 510; United States v. Schlieve, 159 Fed. Appx. 538, 544 fn. 19.

Defendant granted Trooper Nash both oral and written consent to the search of the vehicle. A consensual search is a well-settled exception to the warrant requirement. United States v. Navarro, 169 F.3d 228, 231 (5th Cir. 1999). In determining whether a search based

upon consent is valid, the government must prove that the search was voluntary and that the defendant consented to the search or consent was obtained from a third party with the ability to give valid consent. <u>United States v. Jenkins</u>, 46 F.3d 447, 451-452 (5th Cir.1995). In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of which is dispositive. These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. <u>Id</u>.

Trooper Nash obviously wanted the consent to search to flow from what Defendant perceived as a consensual encounter, so he employed the familiar Lt. Columbo gambit: Trooper Nash issued a traffic citation to Defendant, returned Defendant's license to him, allowed Defendant to begin to return to his car, then engaged Defendant in further conversation which led to the request for consent. However, Trooper Nash candidly admitted that had Defendant refused consent to search, Trooper Nash would have not allowed him to leave and would have requested a K-9 to conduct a sniff of the vehicle.

Thus, approximately 20 minutes after the stop began and about six minutes after obtaining the criminal histories by radio, Trooper Nash asked for and obtained Defendant's oral consent to search the vehicle. About four minutes later, after another trooper arrived, Trooper Nash obtained Defendant's written consent. The delay in seeking and obtaining Defendant's consent was not unreasonable, and there was no evidence that Trooper Nash

unduly delayed the stop for any reason. There also is no evidence that Defendant's consent was obtained as a result of coercion, duress or any other improper means which might cast doubt about its voluntariness. Instead, the evidence shows that Defendant freely and voluntarily consented to the search.

Defendant makes too much out of the fact that Trooper Nash never intended to allow Defendant to leave when Trooper Nash issued the citation to Defendant. The facts show that Defendant believed he was free to leave. But even if he was not really free to leave, this does not undermine Defendant's consent to the search. Defendant's custody status is simply one factor in evaluating the voluntariness of his consent; it is not dispositive. United States v. Nicholson, 983 F.2d 983, 988 (10th Cir. 1993); United States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000), vacated on other grounds, 532 U.S. 1036 (2001). Defendant felt comfortable enough after being handed his citation to turn back to Trooper Nash and ask about the distance that should be maintained between vehicles. Considering the totality of the circumstances in this case, Navarro, 169 F.3d at 231, Defendant's consent to search was given voluntarily and freely, and it was not the product of an illegal detention.

Accordingly;

**IT IS RECOMMENDED** that Defendant's **Motion to Suppress (Doc. 16)** be **denied.**

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Cr. P. 59(b)(2).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 22nd day of August, 2006.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE